**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

DOUGLAS O. COOK,

                Plaintiff,

                                                Case No. 3:18-cv-177-J-JRK

vs.

NANCY A. BERRYHILL,
Deputy Commissioner for Operations
of the Social Security Administration,
performing the duties and functions not
reserved to the Commissioner of
Social Security,

                Defendant.
_____/

## **OPINION AND ORDER**[1]

### **I. Status**

Douglas O. Cook ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying his claim for disability income benefits ("DIB"). Plaintiff's alleged inability to work is the result of spinal damage, a bulging disc, stenosis, a "[b]ack condition," and "[e]ye injuries/condition." See Transcript of Administrative Proceedings (Doc. No. 10; "Tr." or "administrative transcript"), filed April 12, 2018, at 80, 90, 262 (emphasis omitted). Plaintiff filed an application for DIB on April 15, 2013,[2] alleging an onset disability date of December 1, 2011. Tr. at 234. The application was denied initially, Tr. at 80-88, 89, 125, 126-30, and upon reconsideration, Tr. at 90-99, 100, 132, 133-37.

___

       [1]      The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 9), filed April 12, 2018; Reference Order (Doc. No. 12), entered April 20, 2018.

      [2]      Although actually completed on April 15, 2013, see Tr. at 234, the protective filing date of the application is listed elsewhere in the administrative transcript as April 9, 2013, see, e.g., Tr. at 80, 90.

January 22, 2015, an Administrative Law Judge ("ALJ") held a hearing, during which he heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 31-58. The ALJ issued a decision on February 13, 2015, finding Plaintiff not disabled through the date of the decision. Tr. at 104-112. On June 11, 2016, the Appeals Council remanded the matter to the ALJ, finding that the ALJ failed to specify what weight, if any, was accorded to the opinion of Plaintiff's treating physician, Dr. Craig Kornick. Tr. at 118-19. The Appeals Council directed the ALJ to address the opinion of Dr. Kornick, further consider Plaintiff's residual functional capacity ("RFC"), and obtain additional vocational testimony (if warranted). Tr. at 118-19.

On remand, the same ALJ held another hearing on January 5, 2017, during which he heard testimony from Plaintiff, who was again represented by counsel, and a different VE. Tr. at 59-79. Plaintiff was fifty-four years old at the time of the hearing. See Tr. at 80, 90 (indicating date of birth). The ALJ issued a Decision on March 6, 2017, finding Plaintiff not disabled through the date last insured. Tr. 15-25. On November 30, 2017, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner. On January 30, 2018, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff makes two arguments: 1) "[t]he ALJ failed to provide 'good/specific/supported' reasons for rejecting the opinion of Plaintiff's treating physician, [Dr.] Kornick . . ."; and 2) "[t]he ALJ failed to 'accept and include or reject and explain' limitations opined by Jeffrey Levenson, M.D., Plaintiff's treating ophthalmologist." Plaintiff's Memorandum - Social Security (Doc. No. 14; "Pl.'s Mem."), filed June 12, 2018, at 4

(emphasis omitted). In making his first argument, Plaintiff also contends the ALJ erred in "relying solely" on the opinion of the state agency consultant, Audrey Goodpasture, M.D. Pl.'s Mem. at 21.[3] On July 31, 2018, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 15; "Def.'s Mem.") addressing Plaintiff's arguments. After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned finds that the Commissioner's final decision is due to be reversed and remanded for further proceedings because the ALJ erred in considering Dr. Kornick's and Dr. Levenson's respective opinions.

On remand, a proper evaluation of Dr. Kornick's and Dr. Levenson's opinions may impact the ALJ's evaluation of Dr. Goodpasture's opinions. For this reason, the Court need not address Plaintiff's argument regarding Dr. Goodpasture's opinions. See Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be reconsidered on remand); Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues).

## II. The ALJ's Decision

When determining whether an individual is disabled,[4] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining

---

[3] Plaintiff does not refer to Dr. Goodpasture by name, but he cites the portion of the Decision where the ALJ addressed Dr. Goodpasture's assessment. See Pl.'s Mem. at 21 (citing Tr. at 22).

[4] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four, and at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the five-step sequential inquiry. See Tr. at 17-24. At step one, the ALJ determined that Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of December 1, 2011 through his date last insured of December 31, 2016." Tr. at 17 (emphasis and citation omitted). At step two, the ALJ found that "[t]hrough the date last insured, [Plaintiff] had the following severe impairments: degenerative disc disease of the cervical and lumbar spine[,] blindness in the right eye, left knee degenerative joint disease and meniscal tear, [and] right rotator cuff tear." Tr. at 17 (emphasis and citation omitted). At step three, the ALJ ascertained that "[t]hrough the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 17 (emphasis and citation omitted).

The ALJ determined that Plaintiff had the following RFC through the date last insured:

[Plaintiff could have] perform[ed] light work as defined in 20 [C.F.R. §] 404.1567(b) except he require[d] a thirty-minute sit/stand option. He [had to] avoid climbing. He [could] occasionally balance, stoop[,] kneel, crouch and crawl. He [could] perform occasional overhead reaching. He [could not] perform jobs requiring far acuity or more than frequent visual accommodation. He [had to] avoid exposure to moving mechanical parts and unprotected heights. [Plaintiff was] limited to work settings that [did] not require driving automobiles.

Tr. at 18 (emphasis omitted). At step four, the ALJ relied on the testimony of the VE and found that "[t]hrough the date last insured, [Plaintiff] was unable to perform any past relevant work." Tr. at 22 (emphasis and citation omitted); see Tr. at 22-23. At step five, after considering Plaintiff's age ("54 years old . . . on the date last insured"), education ("at least a high school education"), work experience, and RFC, the ALJ again relied on the testimony of the VE and found that "[t]hrough the dated last insured . . . there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed," Tr. at 23 (emphasis and citation omitted), including "Blade Balancer," "Marker II," and "Assembler [E]lectrical [A]ccessories I," Tr. at 24. The ALJ concluded that Plaintiff "was not under a disability . . . at any time from December 1, 2011, the alleged onset date, through December 31, 2016, the date last insured." Tr. at 24 (emphasis and citation omitted).

## III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. § 405(g). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence.'" Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (citation omitted). The decision reached by the Commissioner must be affirmed if it is supported by

substantial evidence—even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV. Discussion

As noted above, Plaintiff takes issue with the ALJ's evaluation of Dr. Kornick's and Dr. Levenson's respective opinions. The undersigned sets out the law applicable to Plaintiff's arguments. Then, Plaintiff's arguments are addressed in turn.[5]

### A. Applicable Law

The Regulations[6] establish a "hierarchy" among medical opinions[7] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5) (2006)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical

---

[5] As noted above, the undersigned does not address Plaintiff's arguments regarding Dr. Goodpasture.

[6] On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (January 18, 2017). Because Plaintiff filed his claim before that date, the undersigned cites the rules and Regulations applicable to Plaintiff's claim, unless otherwise noted.

[7] "Medical opinions are statements from physicians or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1502 (defining "[a]cceptable medical sources"); 20 C.F.R. § 404.1513(a).

evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

With regard to a treating physician[8] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c)(2). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1305 (11th Cir. 2018) (citation omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Hargress, 883 F.3d at 1305 (citation omitted); Phillips v.

---

[8] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)). However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

-8-

**B. Dr. Kornick's Opinions**

Plaintiff argues the ALJ failed to provide reasons supported by substantial evidence for rejecting Dr. Kornick's opinions contained in a Physical RFC Questionnaire. Pl.'s Mem. at 6-22. Plaintiff asserts that "the ALJ gave no obvious consideration to the fact that Dr. Kornick actually examined Plaintiff on multiple occasions (specifically, every 1-2 months since 2009)." Id. at 12. Plaintiff argues that contrary to the ALJ's finding, "Dr. Kornick's opinion is simply not inconsistent with his treatment notes, which constitute the vast majority of the record, or the other medical evidence of record." Id. at 14.

Responding, Defendant contends that "[t]he findings during Plaintiff's treatment with Dr. Kornick detract from his opinion and support the ALJ's findings." Def.'s Mem. at 8. According to Defendant, "Plaintiff's attempt to entice the court to re-weigh the medical opinion evidence must fail." Id. at 9.

Dr. Kornick began treating Plaintiff in July 2009. See Tr. at 369, 527. Dr. Kornick has treated Plaintiff about once a month. Tr. at 527. On August 19, 2013, Dr. Kornick completed a Physical RFC Questionnaire containing opinions regarding the effects of Plaintiff's physical impairments on Plaintiff's ability to perform work-related functions. See Tr. at 527-29. Dr. Kornick opined as follows.

Plaintiff "[c]onstantly" experiences "pain or other symptoms severe enough to interfere with [the] attention and concentration needed to perform even simple work tasks." Tr. at 527. Plaintiff can sit for twenty minutes at a time, can stand for twenty minutes at a time, can sit for a total of two hours in an eight-hour workday, and can stand/walk for a total of two hours in an eight-hour workday. Tr. at 528. Plaintiff would need unscheduled twenty-minute breaks every 1.2 hours during an eight-hour workday. Tr. at 528. Plaintiff "[d]oes best in lying

position." Tr. at 528. Plaintiff's impairments require him to lie down at unscheduled times during an eight-hour time period for no more than three hours. Tr. at 529.

Plaintiff can frequently lift and carry less than ten pounds, can occasionally lift and carry ten pounds, and can never lift and carry more than ten pounds. Tr. at 528. Plaintiff has "significant limitations with reaching, handling[, and] fingering." Tr. at 529. Specifically, Plaintiff can grasp, turn, and twist objects about 25 percent of an eight-hour workday, can perform fine manipulation about 25 percent of the workday, and can reach (including overhead) less than 5 percent of the workday. Tr. at 529. Plaintiff's impairments are likely to produce "good days" and "bad days." Tr. at 529. Plaintiff is likely to miss more than four days of work per month due to his impairments or treatment. Tr. at 529.

> The ALJ gave Dr. Kornick's opinions "little weight" on the following grounds:
>
> [Dr. Kornick's] own treatment notes as well as the rest of the medical evidence do[ ] not support such restrictive limitations. Progress notes from Dr. Kornick document evidence of tenderness to palpation in the lumbar spine with decreased range of motion but motor strength was 5/5 and he had a negative straight leg raise test. Sensation was intact to light touch. [Plaintiff] also reported a 50 percent relief from his back pain and noticeable increase in function lasting three weeks with injections. In 2014, he denied having any neck pain. He denied having any additional significant pain complaints again in August 2014.

Tr. at 22 (citation omitted).

The ALJ's finding that Dr. Kornick's treatment notes and the rest of the medical evidence are inconsistent with the physician's opinions is not supported by substantial evidence. The ALJ mostly cited those portions of Dr. Kornick's treatment notes that show Plaintiff is doing well. A review of the record, however, shows that Plaintiff's condition fluctuated significantly, such that some days Plaintiff was doing better than other days. This is consistent with Dr. Kornick's opinion that Plaintiff's impairments cause him to have "good

days" and "bad days." Tr. at 529. The undersigned finds that the ALJ focused on the "good days" when considering the degree of relief Plaintiff received from injections, the increase in function after the injections, the amount of time this relief and increase in function lasted, and the results of Plaintiff's straight leg tests. As to the ALJ's statements regarding Plaintiff's reports of pain in 2014, they are inaccurate and misleading. These findings are discussed in detail below.

As noted, the ALJ found that Plaintiff reported a 50 percent relief from his back pain and noticeable increase in function lasting three weeks with injections. Tr. at 22. While Plaintiff did in some instances report a 50 percent improvement in pain and a "noticeable increase in function," see, e.g., Tr. at 360, 444, 457, 518, these reports were sporadic. Indeed, many times, Plaintiff reported as low as 10 percent improvement in pain after receiving injections and no noticeable increase in function or only a minimal increase. See, e.g., Tr. at 356 (September 8, 2009 treatment note indicating Plaintiff reported his first lumbar epidural injection on July 30, 2009 provided "25% improvement in lower back pain"); Tr. at 411 (October 4, 2010 treatment note indicating Plaintiff "had a lumbar epidural . . . injection at L5-S1 at his last appointment that provided no significant improvement in lower back pain and no noticeable increase in function"); Tr. at 428 (March 3, 2011 treatment note indicating cervical epidural steroid injection administered on February 4, 2011 "provided no improvement in his pain and . . . no increase in function"); Tr. at 463 (July 6, 2012 treatment note indicating Plaintiff received "trigger point injection(s) in the lumbar paraspinal musculature and bilateral iliolumbar ligament injections [on June 12, 2012] that provided 10% localized improvement in pain and a mild increase in function"); Tr. at 467 (August 6, 2012 treatment note indicating Plaintiff received a "lumbar epidural injection at L5-S1 [on July 6,

2012] that provided approximately 10% improvement in his pain and a minimal increase in function"); Tr. at 480 (October 29, 2012 treatment note indicating Plaintiff received "left-sided lumbar paraspinal trigger point injection and left-sided iliolumbar ligament injection [on August 6, 2012] that provided 25% improvement in his pain and some increase in function"); Tr. at 549 (March 4, 2014 treatment note indicating Plaintiff received "right-sided lumbar paraspinal trigger point injection and right-sided iliolumbar ligament injection [on January 22, 2014] that provided 20% improvement in his pain"); Tr. at 581 (December 10, 2013 treatment note indicating Plaintiff received "bilateral lumbar paraspinal trigger point injections and iliolumbar ligament injections that provided 25% improvement in his pain"); Tr. at 671 (August 7, 2015 indicating Plaintiff received a "left-sided subacromial bursal injection [on June 11, 2015] that provided approximately 10% improvement in his left shoulder pain and a minimal increase in function lasted for 1 day").

Further, the ALJ focused on the one instance when Plaintiff reported that he received a 50 percent relief from his back pain and a noticeable interest in function that lasted three weeks. A review of the record shows that the improvement in pain and the increase in function did not typically last this long. See Tr. at 671 (lasted one day); Tr. at 463 (began to "wear off" after five days); Tr. at 518 (lasted seven days); Tr. at 696, 799 (lasted more than two weeks). This is significant because the length of the pain relief and of the increase in function would have an impact on the number of days Plaintiff would be absent from work either because of his symptoms or because of appointments needed to receive injections. Notably, Dr. Kornick opined that Plaintiff would miss more than four days of work per month. Tr. at 529.

The ALJ's reliance on "a negative straight leg test," Tr. at 22, was also erroneous. Although the administrative contains a number of negative straight leg tests, see, e.g., Tr. at 370, 412, 432, 440, 454, it also includes multiple positive straight leg tests, see, e.g., Tr. at 469, 510, 514, 551, 556, 571. The ALJ, however, focused solely on the negative straight leg tests and appeared to disregard the positive tests. See Tr. at 19, 22.

The ALJ's statement that Plaintiff denied neck pain in 2014 also is misleading; indeed, some of the treatment notes the ALJ cited to support this statement directly contradict it and some actually predate 2014. See Tr. at 549, 573, 577. Plaintiff sometimes did not specifically report neck pain, but the administrative transcript is replete with complaints of neck pain throughout most of Plaintiff's treatment, including in 2014. See Tr. at 603, 610, 633, 639, 662, 671, 677, 690, 769, 793. Tr. at 662.[9] Again, the fact that Plaintiff did not always report neck pain is consistent with Dr. Kornick's opinion that Plaintiff's impairments cause him to have "good days" and "bad days." Tr. at 529.

The ALJ's reliance on Plaintiff's denial of any "additional significant pain complaints" in August 2014, Tr. at 22, was erroneous. The treatment notes that the ALJ cited to support this finding merely indicate there were no pain complaints in addition to Plaintiff's lower back pain complaints. Tr. at 544, 581,[10] 585. It is unclear how a few instances of no complaints of pain besides Plaintiff's primary complaint of back pain are relevant to determining whether Dr. Kornick's opinions should be given controlling weight. Further, on March 22, 2016,

---

[9] The Court notes that prior to 2011, Plaintiff denied neck pain. See Tr. at 364, 367, 383, 387, 389, 411, 417.

[10] The treatment note on page 581 of the administrative transcript is from December 10, 2013, but the ALJ cited it to support the statement that Plaintiff denied any additional pain complaints in August 2014. See Tr. at 581.

-13-

Plaintiff rated his lower back pain at a "9 out of 10," Tr. at 712, so the ALJ's reliance on a lack of complaints additional to lower back pain in August 2014 is confusing.

Thus, the ALJ's finding that the record as a whole is not consistent with Dr. Kornick's opinions is not supported by substantial evidence.[11] Moreover, although there is no rigid requirement that the ALJ specifically refer to every piece of evidence, the ALJ's failure to meaningfully address Dr. Kornick's medical records constitutes such a broad rejection that judicial review is frustrated. See Dyer, 395 F.3d at 1211. The matter is reversed and remanded for reconsideration of Dr. Kornick's opinions.[12]

## C. Dr. Levenson's Opinions

Plaintiff contends the ALJ failed to "accept and include or reject and explain" Dr. Levenson's opinions on Plaintiff's visual limitations. Pl.'s Mem. at 23-24. According to Plaintiff, "Dr. Levenson opined that Plaintiff cannot work with small objects, has diminished depth perception, has difficulty reading and requires magnification for reading, and has no capacity for visual accommodation; the ALJ acknowledged Dr. Levenson's opinions without dispute." Id. at 24 (citation omitted). "Despite this," argues Plaintiff, "the ALJ failed to include any limitations regarding working with small objects, near acuity, and depth perception or, critically, explain his reasoning for excluding these limitations from the RFC." Id. Plaintiff asserts that this error is not harmless because "limitations for near acuity, depth perception, and no accommodation would preclude Plaintiff from performing the jobs the ALJ relied upon to deny benefits." Id. at 25.

---

[11] The undersigned in reaching this conclusion has not re-weighed the evidence. Rather, the entire record has been reviewed to determine whether substantial evidence supports the ALJ's findings.

[12] In reconsidering Dr. Kornick's opinion, the ALJ should take into account the length of the treatment relationship between Dr. Kornick and Plaintiff and the frequency of the treatment.

Responding, Defendant contends that "[t]he ALJ explained that although he did not adopt all the limitations outlined by Dr. Levenson, he gave Dr. Levenson's interrogatory responses some weight as he was a treating physician and specialized in ophthalmology." Def.'s Mem. at 13 (citation omitted). Defendant argues that substantial evidence supports the ALJ's rejection of Dr. Levenson's opined "limitations for near acuity, depth perception, work with small objects, and no accommodation." Id. at 14 (citation omitted). Defendant asserts that any error is harmless. According to Defendant, "Dr. Levenson never opined Plaintiff had no near acuity, only that he would likely require visual aids for magnification of print." Id. at 15. Thus, argues Defendant, Dr. Levenson's opined limitations regarding near acuity, depth perception, and visual accommodation "do not eliminate the job of Blade Balancer" because "[t]he Dictionary of Occupational Titles [('DOT')] indicates that this job includes occasional near acuity, [and] does not include depth perception or accommodation." Id. (citation omitted).

Plaintiff began receiving treatment in Mr. Levenson's practice in 2005. Tr. at 501. In a May 17, 2013 letter to the SSA, Dr. Levenson stated that an eye exam conducted on March 4, 2013 was "notable for the following findings": Plaintiff's "[v]ision in the right eye is limited to the 5/200 level by the presence of [a] dense corneal edema in the setting of a failed corneal transplant"; Plaintiff's "[v]ision in the left eye is limited to the 20/50 level with best correction"; "[g]laucoma is present in each eye"; and "[v]isual field testing in the left eye demonstrates no significant visual field deficit." Tr. at 501. Dr. Levenson stated that Plaintiff is "monocular, and his left eye is mildly compromised by glaucoma in the presence of a decentered anterior chamber intraocular lens." Tr. at 501. He indicated Plaintiff does not

meet Florida's criteria for a driver's license. Tr. at 501. According to Dr. Levenson, Plaintiff "would be expected to have [a] slow reading time." Tr. at 501.

On June 30, 2013, Dr. Levenson completed a Vision Interrogatory containing opinions regarding the effects of Plaintiff's vision impairments on Plaintiff's ability to perform work-related functions. See Tr. at 503. Dr. Levenson opined as follows. Plaintiff "has difficulty reading" and his "depth perception is diminished as well." Tr. at 503. Plaintiff cannot work with small objects such as those involved in sedentary work. Tr. at 503.

On January 27, 2015, Dr. Levenson completed another Interrogatory in which he opined that with regard to Plaintiff's near acuity, Plaintiff "will likely require visual aids for magnification of print" and that "[t]he amount of time in the day [Plaintiff can perform work that requires near acuity] is not a relevant factor; the relevant factor is whether his acuity is adequate." Tr. at 617. He further opined that Plaintiff has "no capacity for accommodation" because "[h]e has a fixed intractable lens which cannot change in focus to adjust at different distances." Tr. at 617. Dr. Levenson confirmed that Plaintiff's testimony that he is required to use an ointment for his left eye approximately three to five times a week during the day and that after he applies the ointment, his vision is decreased, making even ordinary activity difficult (if not impossible) for one hour is "consistent with [Plaintiff's] impairments and the common effects of the ointment." Tr. at 617.

The ALJ summarized Dr. Levenson's opinions and then stated as follows:

> I gave some weight to Dr. Levenson's interrogatories, as he is a treating physician and specializes in ophthalmology. As a result[,] I incorporated the . . . restrictions for no work requiring far acuity or more than frequent visual accommodation or driving. However, the [VE] testified that while [Plaintiff] could not perform the work he did in the past there were other jobs [Plaintiff] could perform in spite of his physical and visual limitations.

Tr. at 22.

The ALJ erred in evaluating Dr. Levenson's opinions. The ALJ failed to articulate reasons showing "good cause" for discounting certain portions of Dr. Levenson's opinions. Hargress, 883 F.3d at 1305. The ALJ's lack of explanation for the weight assigned to Dr. Levenson's opinions frustrates judicial review because the Court is unable to determine whether the ALJ considered the appropriate factors in weighing Dr. Levenson's opinions. Although the ALJ was entitled to weigh the evidence, he was required to provide reasons showing good cause if he was not giving controlling weight to Dr. Levenson's opinions. This, the ALJ failed to do.

The ALJ's error is not harmless. The opinions of Dr. Levenson the ALJ rejected are opinions on restrictions that the VE testified would preclude Plaintiff from performing any work. The VE testified that an individual with Plaintiff's RFC would be capable of performing the jobs of blade balancer, marker II, and assembler electrical accessories I. Tr. at 74-75. (As noted, the ALJ relied on this testimony at step five. See Tr. at 23-24.) The VE then testified, although somewhat hesitantly, that if Plaintiff was further restricted from working with small objects, these jobs "would be precluded based on what [he] determine[s] to be a small object . . . ." Tr. at 76; see Tr. at 503 (Dr. Levenson's opinion regarding working with small objects). He testified that in all those jobs "at some point in time there's going to be some small objects to manipulate." Tr. at 76-77. He also stated that if Plaintiff needed to use an eye ointment about once a day that significantly diminished his vision for an hour after application, he "wouldn't be able to maintain employment" because "[t]hat would exceed acceptable off[-]task behavior over and above usual and customary." Tr. at 77; see Tr. at 617 (Dr. Levenson's opinion regarding Plaintiff's use of ointment). He further testified that if

Plaintiff needed to "use a magnifying lens, and hold it in one hand, then [he would] not . . . be able to do these jobs." Tr. at 77-78; see Tr. at 617 (Dr. Levenson's opinion regarding visual aids for magnification of print). Thus, Defendant's argument that the ALJ's error is harmless because Dr. Levenson's opinion regarding Plaintiff's diminished near acuity would not preclude the job of blade balancer is unconvincing.

Remand is thus warranted for the ALJ to reconsider Dr. Levenson's opinions and provide an adequate explanation for the weight given to them.

## V. Conclusion

For the foregoing reasons, it is

**ORDERED**:

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

    (A) Reconsider the opinions of treating physicians Craig Kornick, M.D. and Jeffrey Levenson, M.D., assign the appropriate weight to such opinions, and explain the reasoning behind the weight assigned;

    (B) If appropriate, reconsider the opinions of Audrey Goodpasture, M.D.; and

    (C) Take such other action as may be necessary to resolve this claim properly.

2. The Clerk is further directed to close the file.

-18-

3. In the event benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on March 27, 2019.

*James R. Klindt*
JAMES R. KLINDT
United States Magistrate Judge

bhc
Copies to:
Counsel of record